**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jess RUSH, Defendant–Appellant.**

No. 21014.

Missouri Court of Appeals,
Southern District,
Division One.

July 9, 1997.

Ellen H. Flottman, Asst. Public Defender, Columbia, for Defendant–Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for Plaintiff–Respondent.

BARNEY, Presiding Judge.

Jess Rush (Defendant) appeals from a jury verdict finding him guilty of first degree murder under section 565.020.1 and kidnapping under section 565.110.[1]  Defendant was sentenced to the Missouri Department of Corrections for a term of life without eligibility for parole or probation for the murder conviction and to a term of fifteen years for the kidnapping conviction.

### I.

Defendant does not challenge the sufficiency of the evidence to support the conviction. We consider the facts and all reasonable inferences therefrom in the light most favorable to the verdict and reject all contrary evidence and inferences. *State v. Wright,* 941 S.W.2d 877 (Mo.App.1997).

### II.

At approximately 10:00 p.m. on January 19, 1991, Trudy Darby was working at the K & D convenience store in Macks Creek, Camden County, Missouri.  Just prior to closing the store for the evening, Ms. Darby noticed a suspicious looking man standing outside the front of the store.  She immediately telephoned her home and spoke to her son,

---

1.  All statutory references are to RSMo 1994, unless otherwise indicated.

Waylon Darby, whom she asked to come to the store to help her close up. That telephone call ended abruptly.

Before her son arrived to help, Trudy Darby was abducted at gun point by at least three men. Upon arriving at the store and discovering that his mother was gone, Waylon Darby called the Camden County Sheriff's Department. Trooper Jimmy Mays of the Missouri State Highway Patrol arrived at the scene and "processed" the store and surrounding area. Despite extensive search efforts that evening, Trudy Darby was not found.

On January 21, 1991, a concerned citizen heard a report from one of his neighbors that he heard a gunshot near the Little Niangua River on the night of Ms. Darby's abduction. After investigating himself and discovering what appeared to be blood and blond hair on the road near the river, the citizen contacted Deputy Crocker of the Camden County Sheriff's Department, who in turn contacted Trooper Mays, and together the two officers went to the river and investigated.

They discovered the blood, hair and a spent .38 caliber shell casing near the river. The two officers also discovered that the flow of the water in the river created a whirlpool near a bridge, and they believed that anything thrown in the river would have either stayed near the whirlpool or would have not floated very far downstream.

Next, the officers contacted the Missouri Highway Patrol and requested a helicopter search along the river. The helicopter search resulted in locating a nude female body that was about four feet under water and approximately three-quarters of a mile downstream from where the blood, hair and shell casing were found. The body was identified as Trudy Darby.

The blood and hair found on the road near the river were later determined to match Trudy Darby's blood and hair by the Missouri State Highway Patrol Crime Laboratory.

An autopsy was performed by Dr. Jay Dix on Trudy Darby's body on January 22, 1991. Dr. Dix determined that Trudy Darby's death was caused by two gunshot wounds.

The first shot entered the right side of her head creating a gutter wound across her right ear, and the bullet then lodged in her skull after traveling about one inch. The trajectory of the bullet indicated that it came from behind and to the right of the victim. The second shot entered the back of Ms. Darby's head and traveled up through her brain before coming to rest below her scalp.

The investigation into who abducted and murdered Trudy Darby revealed little until the Summer of 1994.

Between 1992 and 1993, Defendant was living with family members near Kansas City, Missouri, and during his stay there he revealed to Elizabeth Corpening that he was involved in the abduction and murder of Trudy Darby. Ms. Corpening was disturbed by this revelation but did not take it too seriously.

Thereafter, in 1993 Defendant revealed to Carl Blakely, a former neighbor of Defendant, that he was involved in the abduction and murder of Trudy Darby. However, this time Defendant's revelation was taken seriously and was reported to Trooper Mays. During the same time period, Gretchen Chastain, a former girlfriend of Defendant, also reported to Trooper Mays that Defendant had revealed to her that he was involved in the abduction and murder of Trudy Darby.

Armed with these reports, Trooper Mays had Defendant arrested. After his arrest, Defendant was interviewed by three officers. One of the officers was a juvenile officer because at the time of the murder, Defendant would have been fifteen years old. At the beginning of the interview, Defendant denied his involvement in this crime. However, later during the interview, Defendant changed his mind and revealed that he was present during the commission of the crimes. Defendant also implicated his brother and one other individual.

It appears that Defendant, together with his brother and at least one other person, arrived at the K & D convenience store on January 19, 1991, with the purpose of robbing and abducting Trudy Darby.

After entering the store and taking money from the cash register, Trudy Darby was

dragged out of the store and thrown into the trunk of their automobile. Trudy Darby was then taken to a barn located near the convenience store where she was repeatedly raped and beaten by Defendant and the other persons involved. She was then shot once in the head and placed back into the trunk of their automobile. Defendant and his co-conspirators then drove to the Little Niangua River and opened the trunk and discovered that Trudy Darby was still alive. She was shot in the head again. Her body was then thrown into the river.

During Defendant's incarceration pending trial on this matter, he revealed to at least three inmates that he was involved in the abduction and murder of Trudy Darby. These three inmates each testified against Defendant.

One of the inmates was Edward Thomas, with whom Defendant became acquainted at the Fulton Diagnostic Center. Defendant was under the mistaken belief that Edward Thomas, a "jailhouse lawyer," could help him "beat" the charges pending against him. During the course of several conversations and some thirteen hand-written letters to Edward Thomas, Defendant revealed his involvement in the murder of Trudy Darby.

Thereafter, Edward Thomas turned over all the letters he received from Defendant and revealed the substance of his conversations with Defendant to the Camden County Sheriff's Department. These letters were all introduced into evidence by the prosecution during Defendant's trial.

Defendant did not testify on his own behalf at trial nor did he present any evidence on his behalf. Defendant was convicted by a jury of first degree murder and kidnapping and was sentenced to life in prison without eligibility for parole or probation.

### III.

Defendant raises three points of trial court error: (1) in permitting the State to introduce into evidence certain letters authored by Defendant which suggested that he was involved in other, similar crimes because the probative value of such evidence was substantially outweighed by its unfairly prejudi-cial impact; (2) in not permitting Defendant's counsel to argue during closing argument that the State failed to prove that Defendant had in fact committed the crimes he wrote about in his letters; and (3) in permitting the State to introduce into evidence the prior, sworn testimony of one of the State's witnesses because such evidence contained inadmissible hearsay.

### IV.

The decision whether potentially prejudicial or inflammatory evidence should be admitted lies within the sound discretion of the trial court, which is in a better position to balance the probative value and danger of the evidence. *State v. Shaw,* 636 S.W.2d 667, 672 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Anderson,* 862 S.W.2d 425, 432 (Mo.App.1993). The trial court's decision as to the materiality and relevancy of evidence will not be reversed unless the court abused its discretion. *See State v. Blair,* 638 S.W.2d 739, 757 (Mo. banc 1982).

Defendant argues that the trial court's failure to sustain his objections in allowing into evidence certain letters to Edward Thomas, wherein he mentions his involvement in other similar crimes, was reversible error. Defendant asseverates that the prejudicial impact of such evidence outweighed its probative value. Defendant does not challenge the admission of the letters generally. Defendant maintains that his statements about his involvement in other crimes could have only established Defendant's propensity to commit such crimes and were inadmissible for that purpose. *See State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). We disagree.

As a general rule evidence of uncharged crimes is inadmissible unless the evidence has a " 'legitimate tendency to establish defendant's guilt of the crime charged.' " *State v. Kenley,* 693 S.W.2d 79, 81 (Mo. banc 1985). Such evidence may become admissible when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) common plan or scheme embracing the commission of two or more crimes so related that proof of one tends to establish the other, or (5) identity. *Id.; see*

WILLIAM A. SCHROEDER, 22 MO. PRACTICE (EVIDENCE) § 404.5, at 274–87 (1992).

■ While we acknowledge that criminal defendants have a right to be tried only for the offense for which they are charged, proffered evidence will run afoul of this rule only if it shows that the defendant has committed, been accused of, been convicted of, or *definitely* associated with another crime or crimes. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989) (emphasis added); *see also State v. Schwartz,* 899 S.W.2d 140, 145 (Mo.App.1995). Vague references, on the other hand, cannot be characterized as clear evidence associating a defendant with other crimes. *Id.*

In the present case, six of Defendant's thirteen letters contained scant and vague references to other crimes which cannot be characterized as clear evidence of his having committed them. The thirteen letters in question from Defendant to Ed Thomas consisted of rambling, disconnected thoughts on a variety of topics and subjects. Six of these letters made intertwining, indefinite references to other crimes.[2]

It is noteworthy that in two of Defendant's letters he expressly admitted his direct involvement in the murder of Trudy Darby. In one letter he wrote:

I just wish my brother would have done like I said at the barn and burnt the bitch up but that pussy ass cheevers and parel desided to take the bitch to a fuckin river instead. I was to fucked up to argue with em all I wanted to do was fuck the bitch then shoot her in the head to watch her brains come out. Sounds cool huh? ... if the bitch would have not moved in the trunk at the river my brother wouldn't of had to shoot her in the head again just the have the cops find a shell the stupid mother fucker the only smart thing we did was

have marshels brother greg burn the barn other wise the mother fuckers would have a lot more on us. im glad they don't know every thing else we did or i'd be on death row....

In a second letter he made specific reference to "that bitch we killed in macks creek [Macks Creek, Missouri]."

Additionally, Defendant admitted to Officer Mays that he was present at the convenience store at the time of Trudy Darby's abduction. Defendant also made statements to third parties of his direct involvement in Trudy Darby's kidnapping and murder.

Elizabeth Corpening, testified that "[h]e [Defendant] told me that they had went to rob her [Trudy Darby] at a convenience store ... and [h]e shot her."

Defendant's former neighbor, Carl Blakely, testified that Defendant told him that "they [Defendant and his brother, Marvin] took her to the river to get rid of her, said they shot her in the head once and she wasn't hardly dead and they shot her again. And they went back and burnt the barn, then they went back and cleaned up the evidence and took it and stashed it."

Chris Winters testified that "[h]e [Defendant] told me that him [Defendant] and his brother had kidnapped a woman from some kind of convenience store, said that he put the lady in his brother's car trunk." Winters also stated that Defendant told him that "him and his brother were trying to rape her and she was fighting, and he said that he beat her until she quit fighting ... then he said that he'd shot her ... and had gotten rid of the body and put her in a creek."

■ "The admissions of a criminal defendant are direct evidence of his guilt." *State v. Sumowski,* 794 S.W.2d 643, 646 (Mo. banc

---

**2.** For example, Defendant wrote to Edward Thomas that "I never told you about them other bitchs...." With regard to some evidence, he wrote "because if it gets found by accident it can get us involved in killing them other fucking bitchs...." Furthermore, Defendant wrote "hey dog I tried to explain a little about them other bitchs I hope your not mad at me...." Defendant also explained to Edward Thomas in a letter that "the cops don't even know about my brother

and me killing any other bitchs except Macks Creek." Finally, Defendant wrote that "them other bitchs in my last letter to you were both like that bitch in Macks Creek we all tortured the bitchs then fucked the dog shit out of em...." These examples represent the degree of detail which Defendant referred to other crimes. All spelling and grammatical errors in these examples belong to the author of the letters, Defendant.

1990); *see also State v. Fleer*, 851 S.W.2d 582, 599 (Mo.App.1993).

■ Nonetheless, presuming *arguendo* that the trial court erred in not excising references to other crimes, as contained in some of Defendant's letters, we find that such error was not unfairly prejudicial to Defendant. "The presumption of prejudice from the erroneous admission of evidence may be overcome where the evidence of guilt is so overwhelming as to eliminate any reasonable doubt that the defendant would have been found guilty even without the erroneously admitted evidence." *State v. Troupe*, 863 S.W.2d 633, 636 (Mo.App.1993). Error in the admission of evidence will be declared not unfairly prejudicial "only if we can 'declare a belief that it was harmless beyond a reasonable doubt.'" *State v. Conley*, 938 S.W.2d 614, 620 (Mo.App.1997). We make such a determination in the instant case. Of course, any evidence which adds to the proof of guilt is prejudicial, but in this case it was not unfairly prejudicial. *See State v. Hoff*, 904 S.W.2d 56, 58–59 (Mo.App.1995). Point I is denied.

## V.

Defendant also argues that the trial court abused its discretion and thereby erred in restricting defense counsel from arguing during closing argument that the State did not prove that Defendant committed the other crimes he referred to in some of his letters.

Prior to the beginning of closing argument, the State made an oral motion in limine to prevent defense counsel from arguing and drawing a negative inference from the fact that the State did not *prove* that the Defendant committed the other crimes he referred to in his letters to Edward Thomas. The trial court granted the State's motion.

■ Trial courts have wide discretion in controlling the scope of closing argument. *State v. Barton*, 936 S.W.2d 781, 783 (Mo. banc 1996). Although courts are to be careful to refrain from unduly restricting closing arguments, they have the power to confine the arguments to issues raised by the pleadings and the evidence. *Id.* A party may argue inferences justified by the evidence,

but not inferences unsupported by the facts. *Id.* Courts should exclude only those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury. *Id.*

■ The trial court abuses its discretion when it prevents defense counsel from arguing reasonable inferences from the evidence and precludes the making of a point essential to the defense. *See Barton*, 936 S.W.2d at 783–84. However, even if an abuse of discretion is shown, a case will not be reversed unless the trial court's ruling "prejudiced" the defense. *Id.* at 786. Prejudice is shown when there is a reasonable probability that, in the absence of the trial court's abuse of discretion, the verdict would have been different. *Id.*

■ Additionally, the only argument that the trial court precluded Defendant from making was that the State failed to offer any *proof* of other crimes mentioned by Defendant in his letters. Defendant was otherwise permitted to argue and did argue, the credibility of these statements, as well as the fact that Defendant was given to making boastful lies to appear "cool" to other inmates.

For example, Defendant's counsel stated, *inter alia:*

> The thing I stress to you is that this was a 15 year-old child when this awful thing happened. What does that do to the mind of a child and how does he deal with it? Those of you who have children know that the worst situation, the harder a child tries to rationalize it in his own mind, he needs an excuse or a reason or a justification. At that age, he wants also to prove what a big man he is. . . . But if he tells someone, he has to bluff it out and pretend it was a terrific thing, cool; or else he has to tell it as though he was merely an observer. But that latter option isn't macho, isn't cool; it isn't the way he tells it unless he's talking to someone he perceives to be an understanding person or one in a position of authority.

> \*    \*    \*    \*    \*    \*

> Having said that, can we turn to the statements? Now, as I said before, Jess Rush,

at the age of 15, 16, 17, liked to brag about all the stuff he's done that only men do. It's natural behavior among teenagers. He tells people because he has to. He can't keep it to himself because of the enormity of what he has seen, what happened.... When a teenager brags like that, do you believe him? That's a primary question that you have to answer, because that's what happened. And if you don't believe it, you think he's blowing hot air, you think this is a kid bragging, even under these circumstances, then you have to find him not guilty.

\* \* \* \* \* \*

Jess Rush wants these people to know how tough he is, not only for his own protection, but for the usual macho reasons of telling tall tales about his exploits like other people do.... What you're hearing in that particular situation and you're looking at is a scared kid that wants to tell people that he is not to be messed with.

\* \* \* \* \* \*

The trial court did not abuse its discretion by its limitation imposed upon Defendant's closing argument. Point II is denied.

## VI.

In his final point, Defendant charges the trial court with error in admitting the prior testimony of Timothy McQueen, consisting of sworn testimony given at Defendant's preliminary hearing, wherein Mr. McQueen testified about statements made to him by Marvin Chaney, an alleged co-conspirator in this matter, because such testimony constituted inadmissible hearsay. We note that during the preliminary hearing, Mr. McQueen underwent a thorough cross-examination from Defendant's counsel, and that Defendant himself was present at the hearing. Defendant did not object at trial to the admission of Mr. McQueen's prior testimony. Indeed, Defendant stipulated with the State that Mr. McQueen's prior testimony was admissible in its entirety. Because no objection was made during the trial, Defendant asks this Court to review under the "plain error" rule. *See* Rule 30.20, Missouri Rules of Criminal Procedure (1997).

We decline plain error review. Where no objection is made, the admission of hearsay evidence is not plain error. *State v. Lewis,* 809 S.W.2d 878, 879 (Mo.App.1991). Further, Defendant affirmatively waived our review of the issue when he indicated to the trial court that he had no objection to the introduction of the testimony. *See State v. Taylor,* 943 S.W.2d 675, 680 (Mo.App.1997); *State v. Kezer,* 918 S.W.2d 874, 877 (Mo.App. 1996). Point III is denied.

The judgment is affirmed.